UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* JEFFERY EDWARDS, RELATOR, | **QUI TAM COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| *Plaintiffs,* | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3729 *et seq.*** |
| *v.* | |
| ARTHUR RAYMOND HALBRITTER, DALE ROOD, CLINT HILL, CHARLES FOUGNIER, KELLER GEORGE, KIM JACOBS, BRIAN PATTERSON and GERALD JOHN, | **Civil Action No.** |
| *Defendants.* | 5:20-cv-531 (GLS/TWD) |

Relator Jeffery Edwards brings this action in the name of the United States of America, by and through his undersigned attorneys, Law Office of David Tennant PLLC, and alleges as follows:

## INTRODUCTION

1.      This is a civil fraud action to recover damages and penalties on behalf of the United States of America arising from Defendants' false claims and statements, made in federal applications for grants, direct payments, and contracts, concerning the number of enrolled members in the Oneida Nation of New York ("ONNY")—false claims and statements that (a) materially inflated ONNY's enrollment throughout the relevant period, that is, from in or about 1990 to present; and (b) as a direct and intended result of the materially overstated enrollment numbers, materially increased the amount of the federal aid received throughout

that period.

2.     Numerous federal agencies provide grants, direct payments, contracts, and other financial assistance ("federal aid") to federally-recognized tribes, such as the ONNY, and when they do, often award and allocate such federal funds based in substantial part on the number of enrolled members in the applicant tribe.

3.     Generally speaking, the larger the tribe (i.e., the more enrolled members it reports to the federal government), the more federal dollars it is eligible to receive and will be allocated to it.

4.     For all federal aid programs that take into account the number of enrolled tribal members, a tribe can secure materially greater federal aid—referred to hereafter in the Complaint as "Excess Program Funds"—by materially overstating its enrollment.

5.     At all times relevant to this lawsuit, Defendants conspired to defraud the United States by purposefully overstating the number of enrolled members in ONNY by 25% or more and through such overstatements secured tens of millions of dollars in Excess Program Funds to which they were not entitled and would not have received but for the inflated enrollment numbers.

6.     From in or about 1990 until 2001, Defendants stated (or caused others to state) in federal aid applications (including but not limited to the United States Department of Housing and Urban Development ("HUD") applications) that ONNY's enrolled membership was 1,109.

7.    From 2002 to 2006, Defendants stated (or caused others to state) in federal aid applications (including but not limited to HUD applications) that ONNY's enrolled membership was 1,893.

8.    From 2007 to present, Defendants stated (or caused others to state) in federal aid applications (including but not limited to HUD applications) that ONNY's enrolled membership was an even, unvarying 1,000.

9.    In truth and in fact, at all times relevant to this lawsuit (1989 to present) the ONNY had materially fewer enrolled members than it reported to the federal government when applying for federal aid.

10.    From 1978 to 1991, ONNY's total enrollment did not exceed 800 members.

11.    Based on information and belief, from 1991 to present, ONNY's total enrollment stayed at or below 800 members.

12.    Based on information and belief, tribal enrollment declined between 1991 and present due to the restrictions on eligibility requiring matrilineal descent and at least ¼ Indian blood (with blood from other tribes considered to be acceptable). *See* Paragraphs 27-35 below.

13.    At all times relevant to this lawsuit ONNY did not have a thousand living enrolled members.

14.    At all times relevant to this lawsuit ONNY did not have "approximately 1,000" living enrolled members, as the word "approximately" is

commonly used.

15.     Each and every claim or statement presented by (or caused to be presented by) Defendants in support of applications for federal aid, in which Defendants asserted (or caused to be asserted) that ONNY tribal enrollment was "approximately 1,000," "1,000," "in excess of 1,000," or "more than 1,000," was materially false and fraudulent, knowingly made, and deliberately presented with the intent to mislead and deceive federal agencies into increasing federal funding to ONNY to which it was not entitled, and but for which false and misleading assertions, such Excess Program Funds would not have been allocated to ONNY.

16.     At all times relevant to this lawsuit, each and every statement or claim presented by (or caused to be presented by Defendants) that asserted ONNY had 1,000 or more enrolled members added 200 or more nonexistent, fictious members to the tribal rolls.

17.     Each and every claim or statement presented by (or caused to be presented by) Defendants in support of applications for federal aid, in which Defendants asserted (or caused to be asserted) that ONNY tribal enrollment was 1,109 was materially false and fraudulent, knowingly made, and deliberately presented with the intent to mislead and deceive federal agencies into increasing federal funding to ONNY to which it was not entitled, and but for which false and misleading assertions, such Excess Program Funds would not have been allocated to ONNY.

18.    At all times relevant to this lawsuit ONNY did not have 1,109 living enrolled members.

19.     At all times relevant to his lawsuit, each and every statement or claim presented by (or caused to be presented by Defendants) that asserted ONNY had 1,109 or more enrolled members added more than 300 or more nonexistent, fictious members to the tribal rolls.

20.    At all times relevant to this lawsuit ONNY did not have 1,893 living enrolled members.

21.    Each and every claim or statement presented by (or caused to be presented by) Defendants in support of applications for federal aid, in which Defendants asserted (or caused to be asserted) that ONNY tribal enrollment was 1,893 was materially false and fraudulent, knowingly made, and deliberately presented with the intent to mislead and deceive federal agencies into increasing federal aid to ONNY to which it was not entitled, and but for which false and misleading assertions, such Excess Program Funds would not have been allocated to ONNY.

22.    At all times relevant to this lawsuit, each and every statement or claim presented by (or caused to be presented by Defendants) that asserted ONNY had 1,893 enrolled members added more than 1,000 nonexistent, fictious members to the tribal rolls.

23.     Based on information and belief, Defendant Halbritter personally benefitted from the Excess Program Funds obtained through such overstatements of tribal enrollment data, whether by taking a percentage share of those funds (in effect skimming federal funds as he did other tribal revenue (*see* Paragraphs 81, 82, 90)), or by using the Excess Program Funds to cover tribal expenses that otherwise would have been paid using tribal revenue, thereby increasing the amount of tribal revenue he received.

24.     Based on information and belief, each of the Defendants agreed to and ratified the submission of overstated enrollment data to the federal government to secure Excess Program Funds.

25.     Defendants knowingly made and used (or caused others to make and use) false and fraudulent records regarding tribal enrollment data in applying for federal aid.

26.     Based on information and belief, each of the Defendants benefitted financially by agreeing to and ratifying the submission of overstated enrollment data to the federal government to secure Excess Program Funds.

<u>Oneida  Membership Requirements and Limitations<br>on Population Growth</u>

27.     At all times relevant to this lawsuit, membership in ONNY was based on matrilineal descent and required a minimum "blood quantum of ¼ degree" of Indian blood.

28.     Matrilineal descent means the mother must be an enrolled New York Oneida, and that woman must have at least ¼ degree Indian blood

29.     Every child born to an enrolled New York Oneida woman will take 50% of his/her blood from the mother and 50% from his/her father.

30.     The Tribe in practice has deemed eligible for enrollment persons who can show matrilineal descent from an enrolled New York Oneida and ¼ Indian blood that is a combination of Oneida blood and blood from a member of a tribe within the Haudenosaunee.[1]

31.     The twin membership requirements of matrilineal descent and ¼ Indian blood are part of the Oneida constitution adopted in 1993, have been in effect, unchanged, since 1993, and remain in effect today.

32.     Both the requirement of matrilineal descent and ¼ degree Indian blood are long-standing tribal eligibility rules for the Oneida Nation, and were followed in 1978 when the ONNY prepared its enrollment list that the Bureau of Indian Affairs ("BIA") certified.

33.      ONNY's membership requirements have proved useful to Defendants in that they restrict the number of members who participate in sharing revenue from gaming operations and other tribal businesses.   But the dual restrictions of matrilineal descent and minimum ¼ degree Indian blood severely impair the tribe's sustainability as a distinct population.

---

[1]The Haudenosaunee (also known as the Iroquois Confederacy) consist of Oneidas, Mohawks, Onondagas, Senecas, Cayugas, and Tuscaroras.

34.     Based on information and belief, the percentage of Indian blood in children born to ONNY-enrolled women has consistently declined during the relevant time period.

35.     Based on information and belief, the percentage of children born after 1978 who qualified for Oneida tribal membership by satisfying the twin requirements of matrilineal descent and ¼ Indian blood has declined.

36.     Based on information and belief, the total number of living enrolled members has declined since 1991, i.e., there are fewer living enrolled members in 2020 than in 1991.

37.     Based on information and belief, the total number of living enrolled members has not increased by more than 10% since 1991.

38.     The Tribe's enrolled population (adults and children) never reached 1,000 living members at any time since 1978.

39.     The Tribe's enrolled population (adults and children) never exceeded 900 living members at any time since 1978.

40.     The Tribe's enrolled population (adults and children) never exceeded 850 living members at any time since 1978.

41.     The Tribe's enrolled population (adults and children) never exceeded 800 living members at any time since 1978.

The Scheme to Defraud

42.    Based on information and belief, Defendants Halbritter, Rood, Hill, Fougnier, George, Jacobs and Patterson plotted to overstate tribal enrollment in a deliberate scheme to obtain more federal aid than ONNY otherwise would be entitled to receive.

43.    Based on information and belief, in or about 1990-1991, Defendants Halbritter, Rood, Hill, Fougnier, George, and Patterson for the first time applied for (or caused others to apply for) federal funding from HUD and the Department of Health and Human Services ("HHS") and its Indian Health Service ("IHS"). These applications contained the knowingly false claim and statement that the Tribe had 1,109 members.

44.    From 1991 to 2001, Defendants stated (or caused others to state) in HUD grant applications (and elsewhere) that ONNY's enrolled membership was 1,109.

45.    From 2002 to 2006, Defendants stated (or caused others to state) in HUD grant applications (and elsewhere) that ONNY's enrolled membership was 1,893.

46.    From 2007 to present, Defendants stated (or caused others to state) in HUD grant applications (and elsewhere) that ONNY's enrolled membership was 1,000.

47.     Defendants' decision to report a round number of 1,000 members for federal funding purposes, year over year for a decade, is inaccurate on its face as it does not take into account births and deaths.

48.     Prior to making (or causing others to make) such false and misleading claims in applications for federal aid, the Defendants knew ONNY's enrolled membership was materially below the number they reported.

49.      Prior to making (or causing others to make) such false and misleading claims in applications for federal aid, the Defendants knew ONNY's actual enrolled membership did not exceed 800.

50.     At all times relevant to this lawsuit, the ONNY did not experience double-digit population growth from one year to the next.

51.     The ONNY did not increase its enrolled membership by 400-plus members between 1989 and 1991.

52.     The ONNY did not increase its enrolled membership by 200 members between September 1991 and present.

53.     Defendants Halbritter, Rood, Hill, Fougnier, George, and Patterson knowingly and materially overstated (or caused others to overstate) tribal enrollment numbers each year in federal aid applications from at least 1990 to present.

54.     Defendant Jacobs knowingly and materially overstated (or caused to be overstated), tribal enrollment numbers in federal aid applications each year from at

least 1993 to present.

55.     Defendant John knowingly and materially overstated (or caused to be overstated) tribal enrollment numbers in federal aid applications each year from at least 2006 to present.

56.     Each Defendant ratified the materially false aid applications with knowledge of their falsity.

57.     Each Defendant took no steps to correct the materially false and fraudulent tribal enrollment data contained in federal aid applications.

58.     Each Defendant knew that the ONNY has received Excess Program Funds every year that the Defendants submitted materially inflated tribal enrollment numbers but took no steps to disgorge or otherwise return the Excess Program Funds disbursed by federal agencies to ONNY in reliance on the Defendants' materially false and fraudulent tribal enrollment data.

59.     Defendants' materially false claims and statements relating to the number of enrolled members in the Tribe were intended to—and did in fact—induce federal authorities to increase the amount of federal aid awarded to the ONNY in the form of Excess Program Funds, and but for said materially false and fraudulent claims and statements, the amounts awarded to ONNY would have been materially less.

60.     Defendants' materially false and fraudulent overstatement of tribal enrollment in federal aid applications materially increased the amount of federal aid

awarded to ONNY every year, giving the ONNY materially more money than it was entitled to receive, i.e., Excess Program Funds.

61.     The ONNY first received federal funds in or about 1990.

62.     Since 1990, the ONNY has obtained in excess of $100 million in federal aid from the federal government, with more than $47 million of that federal aid received by the Tribe in the last six years.

63.     Based on information and belief, the ONNY received more than $50 million in Excess Program Funds since 1990.

64.     Based on information and belief, Defendants' scheme to defraud the United States and U.S. taxpayers enabled Defendants to secure approximately $9 million to $14.5 million in Excess Program Funds within the last six years, measured where possible from the second quarter 2014 to first quarter 2020; that is, at least $9 million more than ONNY would have received if the Defendants had provided accurate tribal enrollment data to the federal agencies making those awards.

65.     Defendants' scheme to defraud the United States and U.S. taxpayers, by securing Excess Program Funds through false and fraudulent tribal enrollment data, not only materially increased the amount of federal aid allocated to ONNY but also economically harmed other federally recognized tribes because the pertinent Congressional appropriations each year were finite. The over-allocation of federal aid to ONNY based on inflated tribal enrollment figures effectively shrunk "the pie" for every other eligible tribe.

66.     Defendants' fraudulent scheme is reflected in the ONNY's submissions to HUD and HHS/IHS, both of which expressly rely on tribal enrollment data in the process of determining tribal applicant need and allocating aid.

67.     ONNY was required each year to accurately report its tribal enrollment data to obtain federal aid including from HUD, HHS/IHS, Department of Justice, Department of Transportation, and Department of the Interior (including the BIA), among other federal agencies.

68.     These federal agencies awarded millions of dollars in Excess Program Funds based on the Defendants' submission of materially false and fraudulent tribal enrollment data.

False Claims Act Liability

69.     Defendants and each of them knowingly made (or caused to be made) materially false claims and statements in violation of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*

70.     Defendants and each of them knowingly made and used (or caused to be made and used) materially false records in violation of 31 U.S.C. § 3729(D).

71.     Defendants and each of them knowingly conspired to defraud the United States through violations of  § 3729(B) and (D).

72.     Defendants' fraudulent course of conduct is continuing, as is the conspiracy that enables it to be perpetrated.

73.    Defendants and each of them, with knowledge of the ONNY's receipt of Excess Program Funds, failed to notify the federal government of those overpayments and failed to return those overpayments, in violation of 31 U.S.C. § 3729(G).

74.    Each of the Defendants is a "person" within the meaning of the False Claims Act and is sued in his or her personal capacity for his or her own personal pecuniary benefit received from his or her participation in the fraudulent scheme.

75.    To the extent any Defendant claims that he or she was acting in an official capacity when engaging in the actions of defrauding the federal government of millions of dollars, all such acts and omissions fall outside any immunity generally available to official acts because all such acts were illegal ─ indeed criminal ─ on their face, and, thus, could never have been lawfully authorized by the Nation.

Defendants

76.    Defendant Arthur Raymond Halbritter was appointed Nation Representative in or about 1987.

77.    Defendant Halbritter serves as the Chief Executive Officer of the Nation Enterprises, the business front of the ONNY, a position he has held without interruption since in or around 1990.

78.    In or about 1993, Defendant Halbritter declared himself the leader of the ONNY for life.

79.     For the past thirty years, Defendant Halbritter has ruled in a dictatorial fashion; he makes all important decisions for the Tribe with minimal input from the Men's Council and virtually no input from others.

80.     Defendant Halbritter has a history of ruling the Tribe by force and intimidation, including taking forcible action against members who oppose his leadership and express dissent.  His documented heavy-handed actions include bulldozing the homes of dissenting members, subjecting dissidents to tribal police surveillance, arrest, searches, and imprisonment, and punishing dissenters by disenfranchising them, cutting off revenue sharing from the Oneida businesses, and terminating tribal employment.

81.      For nearly thirty years, Defendant Halbritter has treated the Tribe's assets effectively as his own, personally profiting from the revenue streams from tribal enterprises (principally gaming and smoke shop businesses), "taking his cut" with virtually no one in leadership questioning his self-dealing.

82.     Based on information and belief, Defendant Halbritter receives a percentage of the revenue generated by the Tribe's businesses, including gaming operations; he received 3-4% of the net gaming revenue in or about 1995-1996, worth about $6 million for that year alone.

83.     The gaming enterprises operated by the Nation generate enormous revenue each year.  Each Oneida household would have received more than $350,000 in 2006 if the Defendants had equitably distributed the Tribe's net revenue

that year of at least $110 million.

84.     Based on information and belief, the Tribe's net revenue has doubled since 2006.

85.     Defendant Halbritter articulated a ruling philosophy that, "He who has the gold makes the rules."

86.     Defendant Halbritter refused to share the wealth from tribal enterprises which benefits him in two respects:  (1) its protects his supreme authority while keeping others from challenging his power or acting autonomously; and (2) by keeping the vast majority of ONNY members at or near federal need income levels, he can "game the system" and maximize federal aid.

87.     Defendant Halbritter, and a small number of legal advisors and executive staff under his direction, submitted applications for federal aid from HUD, HHS/IHS, Department of Justice, Department of Interior/BIA and other federal agencies.

88.     Defendant Halbritter publicly stated to tribal members that the ONNY was not receiving federal aid and had in fact given back some federal funds, when in truth and in fact, the ONNY was receiving millions of dollars in federal aid every year.

89.     Defendant Halbritter stated in 1992 that the Tribe would stop receiving federal aid within a year's time when Turning Stone Casino turned profitable.

90.     Based on information and belief, Defendant Halbritter secured (and continues to secure) federal aid to avoid having to use revenue from tribal enterprises to pay for tribal needs, and did so for the express purpose of enabling him to keep more tribal revenue for himself.

91.     Based on information and belief, Defendant Halbritter took (and continues to take) a percentage of the federal aid for his personal use, just as he "skimmed" (and continues to "skim") a percentage of the revenue derived from tribal gaming and other tribal businesses.

92.     For nearly thirty years the Men's Council has done nothing to stop Halbritter from treating the Tribe's assets as effectively his own.

93.     Defendant Dale Rood is a member of the ONNY's Men's Council, a governing body of the Tribe, and has served in that role from at least 1990 to present.  Prior to that, he served on the Tribe's Business Council.

94.     Defendant Clint Hill is a member of the ONNY's Men's Council and has served in that role from at least 1991 to present.  Prior to that, he served on the Business Council.

95.     Defendant Charles "Chuck" Fougnier is a member of the ONNY's Men's Council and has served in that role from at least 1991 to present.

96.     Defendant Keller George is a member of the ONNY's Men's Council and has served in that role from at least 1991 to present.

97.     Defendant Brian Patterson is a member of the ONNY's Men's Council and has served in that role from at least 1991 to present.

98.     Defendant Kim Jacobs has served as Secretary of the Men's Council since at least 1993, and was named Nation Clerk (keeper of the membership data) and then Commissioner of the Nation, which is effectively the second-in-command to Halbritter.

99.     Defendant Gerald "Pete" John is a member of the ONNY's Men's Council and has served in that role from at least 2006 to present.

100.    Upon information and belief, each Defendant has used his or her leadership position in the Nation to personally profit from the Nation's gaming and other commercial ventures and amassed substantial wealth through, inter alia, leadership perks and privileges, and by corruptly diverting tribal revenue to personal accounts, while other tribe members receive a tiny fraction of what would be their per capita share of ONNY enterprise revenue if equitably allocated among tribal members.

101.    Upon information and belief, Defendant Halbritter has abused his position as the self-defined and self-appointed lifetime Nation Representative and CEO to corruptly divert large sums of tribal monies to personal accounts and investments to the detriment of tribal members.

<u>Context for Scheme to Defraud</u>

102.   The ONNY is one of 573 federally recognized tribes in the United States.  As such, the enrolled members of the ONNY are entitled to receive a wide range of federal benefits designated for Native Americans.

103.   Most federal aid to tribes comes in the form of outright grants and direct payments as well as contract money allocated directly to the tribe, or in the case of housing funds, typically provided to a tribally designated housing entity.

104.   Federal control over federal aid awarded to tribes was diminished by passage of the Indian Self-Determination and Education and Assistance Act of 1975 and the Native American Housing Assistance and Self-Determination Housing Act of 1996 (NAHASDA), which enable Indian tribes to directly administer federally-funded programs.

105.   The Department of Interior and BIA rely on tribes to accurately report tribal enrollment and membership.

106.   Tribal enrollment numbers—as reported to the BIA by each tribe—are at times used by federal agencies when determining the amount of aid to allocate between and among tribes.  As a general principle, the greater the number of enrolled members the greater the demonstrated tribal need, and the greater the amount of federal aid available to the tribe.

107.   As a general matter, federal aid awarded to tribes is authorized by Congress in annual appropriations that are capped.  If a tribe overstates its

enrollment number and secures more federal aid than it otherwise should have received, the immediate consequence is that other tribes receive less than they should have—i.e., the "pie" has shrunk for every other tribe.

108.    Tribal enrollment—the actual number of living members counted by a tribe on its official rolls and reported to the BIA—is an express factor in the award of grants and contracts to tribes by HUD under NAHASDA.

109.    HUD developed a specific formula, in partnership with tribes, to equitably allocate Indian Housing Block Grant ("IHBG") funds among tribes based on need.  It uses BIA official tribal enrollment numbers—as provide by the tribes to BIA—in determining the allocation of funds to eligible grant recipients. This formula is referred to as the "IHBG formula" and is described in HUD regulations at 24 CFR Part 1000, subpart D.  *See* 25 CFR 1000.302(d) ("Allocation formula").

110.    Under the IBHG allocation formula, each applicant tribe must annually report its "Tribal Enrollment" as determined by "BIA Enrollments" and record it on the Formula Response Form, HUD-4117. *See* 24 CFR 100.302(5) and HUD Formula Response Form HUD-4117 at 8.

111.    HUD advises tribal applicants to "carefully review your Tribe's data" before submitting the HUD Formula Response Form.  *See* HUD-4117 at 1.

112.    Each applicant tribe is required by HUD regulations (24 CFR 1000.315(b)) to report any changes to its tribal enrollment numbers on the Formula Response form.  *See* HUD-4117 at 1-2.

113.   The IHBG formula uses the tribe's official BIA enrollment as a foundational fact upon which to determine—and cap—total funding for that tribe for purposes of providing housing to its members, with an important proviso. Under the IHBG formula, the applicant tribe is permitted to include in its headcount certain non-members provided they are American Indian/Alaska Native ("AI/AN"), eligible to receive federal services, and live near the applicant tribe's reservation in a designated service area.

114.   As explained in the following paragraphs, HUD uses tribal enrollment data (and other weighted factors) to proportionally allocate funds among the affected tribes. *See* Formula Response Form HUD-4117 at 7-8.  A tribal applicant under IHBG thus is eligible to receive increased funding if it reports a greater number of enrolled members and other AI/AN the tribe serves, but that enhanced aid allocation is capped at twice the tribe's stated enrollment.

115.   The doubling of HUD funding permitted under the IHBG formula means that when a tribe provides housing to "other Indians" and overstates its tribal enrollment, that overstatement is multiplied, up to a full doubling of its reported enrollment.

116.   The allocation of federal aid under the IHBG, using the IHBG formula, is calculated by the IHBG Formula Customer Service Center, a company contracted by HUD to run the data analysis for formula allocations for all participating tribes.

117.    The HUD IHBG formula is used by other federal agencies including HHS/IHS, the Department of Justice, and the Department of Transportation, when allocating federal aid to tribes.

118.    Based on information and belief, the Department of the Interior/BIA and numerous other federal agencies award federal aid to tribes based in part on tribal enrollment, and that Defendants' false claims and statements in applications to the Department of the Interior/BIA and these other departments/agencies have secured Excess Program Funds in the form of grants, direct payments and contracts that but for the Defendants' materially false and fraudulent claims and statements, would not have been awarded to ONNY.

119.    Based on information and belief, the Defendants' fraudulent scheme has included (and still includes) overstating ONNY's tribal enrollment to secure federal contracts for tribally-owned businesses, including but not limited to Oneida Technical Solutions.

120.     Based on information and belief, in any aspect of its governmental and commercial activities where the ONNY can financially benefit from overstating its enrollment, it has. This includes in every governmental or commercial interaction with the federal government where tribal enrollment is a factor in the issuance of any form of federal aid.

121.    Given the vast scope of the ONNY's tribal enterprises, the opportunity for the Defendants to secure Excess Program Funds based on materially inflated

tribal enrollment is similarly vast, extending far beyond the grants, direct payments and contracts identified in this Complaint.  Such information is in possession of the Defendants.

122.    By this action Relator seeks to recover all such Excess Program Funds.

<u>The False Claim Act</u>

123.    The False Claims Act ("FCA") is an anti-fraud statute that may be enforced not just through litigation brought by the Federal Government itself, but also through civil qui tam actions that are filed by private parties, called relators, in the name of the Government.

124.    The FCA imposes liability on any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or who otherwise improperly makes false statements to the Government. 31 U.S.C. § 3729(a)(1)(A)-(G).  The FCA further imposes liability on those who engage in a conspiracy to defraud the public treasury provided the unlawful agreement results in a violation of FCA's substantive provisions.  31 U.S.C. § 3729(a)(1)(C).

125.    The False Claims Act provides that any person who violates the Act "is liable to the United States Government for a civil penalty … plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

126.    Under the FCA, liability attaches when a defendant submits or causes another to submit a false or fraudulent claim or statement, or uses or causes another to use a false record to obtain federal grants and contracts.

127.    The FCA permits any person having information regarding a false or fraudulent claim for federal grants, direct payments, or contracts to bring an action for himself/herself as the Relator and for the Government and allows him/her to share in any recovery.

128.    Based on the foregoing provisions, Relator asserts violations of federal law in connection with materially false claims and statements made by Defendants in connection with ONNY's applications seeking federal aid from HUD, HHS/IHS, Department of Justice, Department of Transportation, and other federal agencies. Each such agency provided federal aid to ONNY in reliance on Defendants' false representation that the Tribe had 1,000 or more members—knowingly false statements that were material to the Government's funding decisions and in fact induced each federal agency to disburse more aid to ONNY than it was entitled to receive, and would not have received but for the overstatements of its enrollment. This fraud is continuing.

129.    Relator seeks to recover all available damages, civil penalties, and all other relief available in connection with Defendants' false and fraudulent claims and statements in securing Excess Program Funds through overpayment of grants, direct payments and other awards from the Government, including treble damages and

penalties under the FCA.  Damages owed to the Government include, but are not limited to, the full value of all improper awards of federal funds to the ONNY based on the materially inflated tribal enrollment numbers submitted or caused to be submitted by Defendants, which the Government would not have awarded to ONNY but for Defendants' materially false claims and statements (i.e., Excess Program Funds).

130.    Defendants' wrongful practices include consistently and purposefully overstating tribal enrollment numbers on the HUD-4117 form by fabricating 200 or more nonexistent members at any given time, including in every tribal application for federal grants and contracts since in or about 1989, as well as by failing to decrease tribal headcount when enrolled members died or were expelled.

131.    Based on information and belief, the Government would have awarded at least $9 million less in federal funds to ONNY in the last six years.

132.    The materiality of the Defendants' false statements, which inflated ONNY's tribal enrollment by at least 25%, is demonstrated by the  enforcement action taken by the HUD Office of Inspector General with respect to the Picayune Rancheria of Chukchansi Indians ("Chukchansi Tribe") in Oakhurst, California (Audit Report Number 2017-LA-1007, August 24, 2017).

133.    The HUD Inspector General responded to a hotline report that the Chukchansi Tribe had overstated tribal enrollment numbers to HUD resulting in the tribe's housing authority receiving more funding than it should have.

134.    The HUD Inspector General determined that the Chukchansi Tribe had reported its enrollment on the HUD-4117 Formula Response Form, which the HUD Formula Service Center relied on in calculating the award for the tribe.

135.    The HUD Inspector General concluded that the reported enrollment figure of 1,234 for the Chukchansi Tribe was unreliable and estimated the actual enrollment was about 20% (200 members) lower.

136.    The HUD Inspector General determined that the enrollment overstatement on the HUD 4117 Formula Response Form was material to HUD's funding decision.

137.    The HUD Inspector General determined HUD had issued $248,222 in "excess funds" based on the tribe's inflated enrollment figure, and recommended that HUD recapture that amount from the tribe's housing authority.

138.    HUD reclaimed the "excess funds" from the Chukchansi Tribe.

139.    The ONNY's deliberate inflation of its enrollment number to each federal agency was material to every funding decision by a federal agency that looked to tribal headcount in determining the amount of the award to make.

## JURISDICTION AND VENUE

140.    This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732, conferring jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730, and pursuant to 28 U.S.C. § 1331, conferring jurisdiction over all civil actions arising under the laws of the United States.

141.    Venue is proper in this District because Defendants can be found in and transact business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by Defendants in this District. Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).

142.    Relator shall serve a copy of this Complaint upon the United States. Relator will also serve upon the United States a written disclosure statement setting forth and enclosing all material evidence and information he or she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

## THE PARTIES

143.    The plaintiffs in this action are the United States, through its agencies the United States Department of Housing and Urban Development ("HUD"), the United States Department of Health and Human Services ("HHS") and its Indian Health Service ("IHS"), the United States Department of Justice ("DOJ"), and the United States Department of the Interior ("DOI") and its Bureau of Indian Affairs ("BIA").

144.    Relator Jeffery Edwards is a Native American (Mohawk father and Oneida grandmother); is a citizen of the United States, and resides in Onondaga County in the State of New York.

145.    Relator is an original source of the allegations contained in this Complaint.

146.   Relator was employed by the ONNY as Executive Director of the Nation's Housing Authority from 1992 to 1994.

147.   Defendants are leaders of the ONNY who have abused their positions of power to maximize the award of federal aid to ONNY by knowingly and materially overstating the tribe's enrolled membership to secure federal aid to which the ONNY was not entitled and which the ONNY would not have received but for Defendants' false and fraudulent claims and statements.

148.   Based on information and belief, Defendant Halbritter has personally profited, and continues to personally profit, from the ONNY's receipt of Excess Program Funds, just as he has personally profited, and continues to profit from, all sources of tribal revenue, including gaming and smoke shops.

149.   Based on information and belief, Defendant Halbritter is a centimillionaire, if not a billionaire, from his share of the revenue from Turning Stone Casino and personal investments of the same, as well from his share of other Nation enterprise revenue.

150.   Based on information and belief, Defendants personally profited, and continue to personally profit, from the ONNY's receipt of Excess Program Funds.

## LEGAL BACKGROUND

151.   The United States' claims against Defendants under the FCA are based upon materially false or fraudulent claims that Defendants presented or caused to be presented to the various federal agencies when applying for federal aid (direct

payments, grants and other awards) from 1989 to present.  These claims were false or fraudulent in that the Defendants' knowingly and materially overstated and/or caused others to overstate the ONNY's enrolled membership by at least 200 people, which represents at least a 25% overstatement of the Tribe's enrolled membership.

152.    Defendants have systematically violated the requirements for applying for federal aid including failing to submit the required accurate Tribal Enrollment data each year on the HUD-4117 Formula Response Form and failing to make the required corrections to the erroneous data on that form each year.

## **FACTUAL BACKGROUND**

153.    Relator repeats and realleges Paragraphs 1-152 as though set forth herein.

154.    In furtherance of the scheme to defraud the United States, Defendants knowingly submitted (or caused to be submitted) materially false claims, statements and records concerning ONNY's tribal enrollment when applying for federal aid from 1989 to present.

### Fraud Against HUD

155.    The last six years of publicly reported disbursements of federal aid (Second Quarter 2014  to First Quarter 2020) show HUD awarded IHBG grants and direct payments to ONNY approaching $3 million based on the false and fraudulent claim that ONNY's tribal enrollment was 1,000 and the AI/AN service population was 2,000.

156.    The HUD grant amounts (and grant numbers) are available on the usaspending.gov website as well as on HUD's website[2] The information is summarized in the chart below, using publicly available data:

*Indian Housing Block Grant*

| Fiscal Year | Enrollment | AI/AN | IHBG Grant |
|---|---|---|---|
| 2014Q2 -2015Q1 | 1,000 | 2,000 | $200,108 |
| 2015Q2 - 2016Q1 | 1,000 | 2,000 | $215,263 |
| 2016Q2 -2017Q1 | 1,000 | 2,000 | $212,263 |
| 2017Q2 -2018Q1 | 1,000 | 2,000 | $222,584 |
| 2018Q2 -2019Q1 | 1,000 | 2,000 | $227,071 |
| 2019Q2 -2020Q1 | 1,000 | 2,000 | $790,973 |

157.    In 2015 HUD additionally awarded grants/direct payments to the Tribe in the amount of $1,077.791.

158.    Based on information and belief, with respect to each of the HUD grants/direct payments identified in ¶¶ 155 and 156, Defendants submitted or caused to be submitted materially false and fraudulent Tribal Enrollment data on the Formula Response Form HUD-4117 (or its equivalent) on or before the due date of October 1 in each preceding year, as directed by HUD to receive funding in the following Fiscal Year.

---

[2] https://www.hud.gov/program_offices/piublic_indian_housing/ih/codetalk/comp/ihbg/formula

159.    Defendants failed to correct (or cause others to correct) the materially false and fraudulent Tribal Enrollment data, as required by HUD regulations.

160.    Relator does not know the precise dates that Defendants submitted (or caused to be submitted) the materially false and fraudulent Formula Response Form HUD-4117 (or its equivalent) in each program year.  That information is in the possession of Defendants (and the ONNY and any tribally designated housing entity that may have received IHBG funding directly) and HUD (including the IHBG Formula Customer Service Center) which received the Tribe's formula response form.

161.    Based on information and belief, Defendants complied with each deadline for submitting the application to HUD for IHBG federal aid and either mailed or faxed the ONNY's application to HUD's Formula Customer Service Center on or before October 1 of the year prior to the fiscal year in question.

162.    Defendants' materially false and fraudulent claims and statements were intended to secure Excess Program Funds from HUD and in fact did so each year.

163.    The precise computation of the amount of the Excess Program Funds awarded by HUD to ONNY each year must await certain calculations by the IHBG Formula Customer Service Center; based on information and belief, HUD overpaid ONNY by at least 18.5% in each of the last six years.

164.   The funding for IHBG awards comes from finite annual appropriations by Congress; the payment of Excess Program Funds each year to ONNY reduced allocations to every other tribe that received those grants in the same year.

165.   The Excess Program Funds allocated by HUD to ONNY represent recoverable damages in this action.

<u>Fraud Against Indian Health Service</u>

166.   The Indian Health Service ("IHS") provides grants and contract money to tribes to fund various health programs and services in Indian country, including funding Indian-run Contract Health Services.

167.   As with HUD programs for Indians, tribes have assumed responsibility for administering federally-funded IHS programs under the authority of the Self-Determination Act.[3]

168.   IHS funding for Contract Health Services is based in substantial part on tribal enrollment as reported by the tribe.

169.   IHS employs the IHBG formula to allocate federal funding for Community Health Services and other programs.

---

[3] Under the Indian Self-Determination and Education Assistance Act, as amended, federally recognized Indian tribes can enter into self-governance compacts or self-determination contracts with the Secretary of HHS to take over administration of IHS programs provided for the benefit of Indians previously administered by IHS on their behalf. Self-governance compacts allow tribes to consolidate and assume administration of all programs, services, activities, and competitive grants administered by IHS, or portions thereof, while self-determination contracts allow tribes to assume administration of a program, programs, or portions thereof. *See* 25 U.S.C. §§ 450f(a) (self-determination contracts), 458aaa-4(b)(1) (self-governance compacts).

170.   IHS allocates additional funds to tribes to provide Contract Health Services to Native Americans living within a designated tribal service area.

171.   The funding for Contract Health Services comes from finite annual appropriations by Congress.

172.   The IHS, when allocating federal funds for Contract Health Services, employs the IHBG formula to equitably allocate the funding among tribes and in doing so expressly weighs tribal enrollment data as those tribes report it.

173.   Based on information and belief, if a tribe materially inflates its tribal enrollment number when applying for funding to operate a Contract Health Service, it can secure materially greater additional funding to serve other Indians within a larger territorial area—the same kind of doubling effect that occurs under the IHBG program.

174.   Once the IHS establishes a Contract Health Service, funding in subsequent years will be based primarily on the initial contract—in other words, the first year of funding provides a foundation to build on in subsequent years.  If that first-year contract amount is materially inflated because the tribe overstated its enrollment, that error is carried forward into every subsequent year unless corrected by the tribe.

175.   Based on information and belief, Defendants Halbritter, Rood, Hill, Fougnier, George and Patterson conspired in or about 1990 (later joined by Defendants Jacobs and John) to obtain federal aid from the IHS to establish and

operate a Contract Health Service for ONNY's own members and to create a money-making medical business to serve other Indians within a multi-county service area (varying from 6 to 10 counties), and did so based on their agreement to knowingly and materially inflate tribal enrollment to 1,109 members (doubled to 2,218 Indians under the AI/AN service population) which added hundreds of "missing Oneida" (i.e., non-existent, fictitious members) to the rolls.

176.   Based on information and belief, the IHS relied on the materially false and fraudulent tribal enrollment data submitted by or on behalf of Defendants in support of the ONNY's application to establish and operate a Contract Health Service.

177.   The ONNY's Contract Health Service is the most expensive service in the United States when measured on a per capita basis.

178.   Based on information and belief, the Oneida Contract Health Service generates substantial profits for the Nation and is personally financially lucrative to Defendants.

179.   The last six years of reported federal funding for HHS (2014Q2-2020Q1) show the IHS made direct payments and grants to ONNY just under $27 million in reliance on the materially false and fraudulent claim that ONNY's tribal enrollment was 1,000.

180.   The IHS grants and direct payments for Contract Health Services are available on the usaspending.gov website. The information is summarized in the

chart below:

*Indian Health Service Contract Health Service Funding*

| Fiscal Year | Enrollment | Direct Payments and Grants |
|---|---|---|
| 2014Q2 -2015Q1 | 1,000 | $4,376,963 |
| 2015Q2 - 2016Q1 | 1,000 | $4,511,413 |
| 2016Q2 -2017Q1 | 1,000 | $2,350,798 |
| 2017Q2 -2018Q1 | 1,000 | $5,553,526 |
| 2018Q2 -2019Q1 | 1,000 | $3,662,674 |
| 2019Q2 -2020Q1 | 1,000 | $6,284,470 |

181.   Based on information and belief, with respect to each of the grants and direct payments awarded to the ONNY for Contract Health Service between 2014 and 2020 as listed above in Paragraph 180, Defendants submitted or caused to be submitted false and fraudulent Tribal Enrollment data through the IHBG formula process as assumed by the IHS, or Defendants otherwise presented the inflated tribal enrollment data to the IHS in support of ONNY's application for Contract Health Service direct payments and grants.

182.   Defendants failed to correct (or cause others to correct) the materially false and fraudulent Tribal Enrollment data, as required by federal regulations.

183.    Relator does not know the precise mechanism by which Defendants submitted (or caused to be submitted) the materially false and fraudulent tribal enrollment data to the IHS, or the dates of those submissions, although it may track the dates and schedule for submission under the IHBG formula procedure.   The specific information regarding the time and form of the false claims and statements is in the possession of Defendants (and the ONNY) and the IHS which received the tribal enrollment information either directly or through the IHBG formula procedure.

184.    Based on information and belief, Defendants complied with the deadline for submitting the application to the IHS for Contract Health Service grants/contracts for each fiscal year in question.

185.    Defendants' materially false and fraudulent claims and statements were intended to secure Excess Program Funds from the IHS and in fact did so each year.

186.    Based on information and belief, ONNY received materially greater aid based on the inflated tribal enrollment data submitted (or caused to be submitted) by Defendants, with the ill-gotten Excess Program Funds exceeding 18.5% of the total award.

187.    The precise computation of the amount of the Excess Program Funds awarded by the IHS to ONNY based on the materially false and fraudulent enrollment data—that is, the amount of aid that would not have been awarded to

ONNY but for Defendants' false claims and statements—must await further proof (including information in the possession of Defendants and others) and may require calculations by the IHBG Formula Customer Service Center.

188.    The Excess Program Funds allocated by IHS represent recoverable damages in this action.

<u>Fraud Against the Department of Justice</u>

189.    The Department of Justice employs the IHBG formula and takes tribal enrollment into account when awarding grants, direct payments, contracts, and other federal funding to tribes.

190.    The DOJ awarded $5,899,176 to ONNY between 2014 Q2 and 2020Q2[4] as summarized below:

*Department of Justice*

| Fiscal Year | Enrollment | Grant |
|---|---|---|
| 2014Q2 -2015Q1 | 1,000 | $766,248 |
| 2015Q2 - 2016Q1 | 1,000 | $2,421,931 |
| 2016Q2 -2017Q1 | 1,000 | $698,788 |
| 2017Q2 -2018Q1 | 1,000 | $826,383 |
| 2018Q2 -2019Q1 | 1,000 | $977,394 |

---

[4] DOJ data is not available for 2019 as of filing.  The Department of Homeland Security provided $208,430 in 2019 to support ONNY tribal policing.  Based on information and belief that aid award took tribal headcount into account.

| 2019Q2 -2020Q1 | 1,000 | $208,432 |
|---|---|---|

191.    Based on information and belief, Defendants submitted (or caused to be submitted) materially false and fraudulent claims and statements, overstating ONNY's tribal enrollment, and did so with the intent to secure Excess Program Funds from the DOJ.

192.    Based on information and belief, the DOJ relied on the materially false and fraudulent claims and statements (in which Defendants deliberately overstated enrollment numbers, or caused others to overstate) in determining the amount of aid awarded to ONNY.

193.    Relator does not know the precise mechanism by which Defendants submitted (or caused to be submitted) the materially false and fraudulent tribal enrollment data to the DOJ, or the dates of those submissions, although it may track the dates and schedule for submission under the IHBG formula procedure.  The specific information regarding the time and form of the false claims and statements is in the possession of Defendants (and the ONNY) and the DOJ, which received the tribal enrollment information either directly or through the IHBG formula procedure.

194.    Based on information and belief, Defendants complied with the deadline for submitting the application to the DOJ to secure the federal aid for each fiscal year in question.

195.    Based on information and belief, the DOJ allocated Excess Program Funds to ONNY, that is, more federal funds than it would have if the Defendants had presented (or caused to be presented) an accurate tribal enrollment number.

196.    Based on information and belief, ONNY received materially greater grants and direct payments based on the inflated tribal enrollment data submitted (or caused to be submitted) by Defendants, with the ill-gotten Excess Program Funds exceeding 25% of the total award.

197.    The amount of the Excess Program Funds paid by the DOJ to ONNY has not been quantified.   Relator is not in possession of information that would permit quantification.    That information is known to the DOJ and/or the Department of the Interior, or can be computed through Government resources such as the Formula Customer Service Center.

198.    The Excess Program Funds allocated by the DOJ to ONNY represent recoverable damages in this action.

<u>Fraud Against the Department of the Interior</u>

199.    The Department of the Interior (including the BIA) awarded direct payments to the ONNY between 2014Q2 and 2020Q1 in the total amount of $12,784,120, as follows:

*Department of Interior*

| Fiscal Year | Enrollment | Grant |
|---|---|---|
| 2014Q2 -2015Q1 | 1,000 | $1,507,583 |
| 2015Q2 - 2016Q1 | 1,000 | $1,676,995 |
| 2016Q2 -2017Q1 | 1,000 | $1,790,604 |
| 2017Q2 -2018Q1 | 1,000 | $2,283,751 |
| 2018Q2 -2019Q1 | 1,000 | $2,265,966 |
| 2019Q2 -2020Q1 | 1,000 | $3,259,241 |

200.   The DOI takes tribal enrollment into account when awarding grants and direct payments to tribes under many of the programs it administers for the benefit of tribes.

201.   The BIA stated on December 21, 2019, through an official spokeswoman addressing congressional recognition of the Little Shell Chippewa tribe, that "[h]ow much aid the tribe receives will depend on the number of certified members."

202.   Relator does not possess knowledge as to the myriad federal programs for Native Americans administered by Interior which take tribal enrollment data into account and thus were and are impacted by the ONNY's inflated enrollment figures.

203.    For every DOI program that takes tribal enrollment into account in allocating funds, the Defendants' materially false statements, inflating the number of enrolled members in the ONNY, caused the DOI to award Excess Program Funds to ONNY.

204.    Relator is presently unable to quantify the amount of federal funds allocated by Interior to ONNY as Excess Program Funds.  Such information lies peculiarly within the knowledge of Defendants and the Government, and/or can be computed through Government resources such as the Formula Customer Service Center.

205.    The Excess Program Funds allocated by the DOI to ONNY represent recoverable damages in this action.

<u>Fraud Against Other Departments of the United States</u>

206.    Based on information and belief other federal agencies take tribal enrollment into account when allocating federal grants, direct payments, contracts, and other federal aid to tribes and tribally-owned businesses, whether they employ the IHBG formula, a statutory or regulatory variant of that formula, or some other means of determining need and allocating finite resources among tribes and determining contract awards for tribally-owned businesses.

207.    Through discovery, Relator intends to develop the record to identify each federal agency and program that takes tribal enrollment into account in making awards of federal aid to tribes, and thereby identify additional awards of federal aid

to the ONNY that constitute Excess Program Funds and thus recoverable damages in this action.

## FIRST CLAIM

### Violations of the False Claims Act: Making or Using a False Record or Statement (31 U.S.C. § 3729(a)(1)(A))

208.    Relator repeats and realleges Paragraphs 1-207 as though set forth herein.

209.    The United States seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (2010).

210.    As set forth above, in connection with the foregoing schemes, Defendants knowingly, or with reckless disregard for the truth, presented and/or caused to be presented materially false or fraudulent claims regarding tribal enrollment data with the intent to use the inflated enrollment numbers to influence federal agencies to award greater amounts of federal funds to ONNY—materially more federal aid than the ONNY would have received had accurate tribal enrollment data been provided (i.e., Excess Program Funds).

211.    By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

## SECOND CLAIM

## Violations of the False Claims Act: Making or Using a False Record or Statement
## (31 U.S.C. §3729(a)(1)(B))

212.    Relator repeats and realleges Paragraphs 1-211 as though set forth herein.

213.    The United States seeks relief against Defendants under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2010).

214.    As set forth above, in connection with the foregoing schemes, Defendant knowingly, or in reckless disregard of the truth, made, used, and caused to be made and used materially false records and statements material to false or fraudulent claims.

215.    By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

## THIRD CLAIM

## Conspiracy to Violate False Claim Act
## (31 U.S.C. § 3729(a)(1)(C))

216.    Relator repeats and realleges Paragraphs 1-215 as though set forth herein.

217.    Defendants engaged in a three decades' long conspiracy to defraud the United States through the submission of materially false and fraudulent tribal enrollment data to secure federal funding that, but for the false and fraudulent

statements, would not have been obtained.

218.   The agreement was forged initially in or about 1990 to inflate the enrollment number from around 700 to 1,109, and then increase it to 1,893, and then finally settle on 1,000, where it has remained by agreement for twenty years.

219.   This long-standing and continuing fraudulent scheme, by which tens of millions of dollars in federal aid were improperly and unlawfully obtained by Defendants, could only have been perpetrated—and sustained without interruption for thirty years—by an organized and sophisticated group of individuals who agreed on this illegal course of action and cooperated in its commission year after year, which required bringing new members of the Men's Council into the conspiracy to defraud the United States.

220.   Defendants conspired among themselves as well as with numerous other co-conspirators, known and unknown, including but not limited to other members of the ONNY, and legal counsel representing the ONNY and the Defendants, to commit a violation of 31 U.S.C. § 3729, subparagraphs A, B, D, E, F, and G.

## FOURTH CLAIM

### Fraudulent Inducement under False Claim Act

221.   Relator repeats and realleges Paragraphs 1-220 as though set forth herein.

222.    The Defendants' false statements and fraudulent conduct, through which Defendants knowingly provided materially overstated tribal enrollment data to secure Excess Program Funds, required Defendants to submit (or caused to be submitted) materially false written applications at the inception of each program year.

223.    The award of grants and direct payments to the ONNY did not produce a tangible benefit to the federal government.

224.    The federal government's funding of services for Native Americans is not intended to produce tangible benefits to the federal government.

225.    Because all the grants and direct payments to ONNY did not produce tangible benefits to the federal government, and all such funds were induced by the Defendants making false statements at the beginning of each program year, Defendants should be ordered to disgorge all program funds received from the federal government in an amount to be proved at trial.

**WHEREFORE, Relator, on behalf of himself as well as the United States, requests the following relief:**

   a.    A judgment against Defendants in an amount equal to all damages due to the Government, including treble damages, pursuant to the FCA;

   b.    A judgment against Defendants for all civil penalties due to the Government for each of Defendants' violations of the FCA;

   c.    A judgment of disgorgement against Defendants requiring all federal aid to be returned to the Government;

d.   That Relator recover all costs of this action, with interest, including the cost to the Government for its expenses related to this action;

e.   That Relator be awarded all reasonable attorneys' fees and costs in bringing this action;

f.   That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

g.   That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

h.   That a trial by jury be held on all issues so triable;

i.   An award of pre-judgment interest; and

j.   Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL.**

Dated:  May 7, 2020

**LAW OFFICE OF DAVID TENNANT PLLC**

By:   /s/ David H. Tennant

Bar Roll No. 510257

David H. Tennant, Esq.
*Attorneys for Relator*
3349 Monroe Avenue, Suite 345
Rochester, New York 14618
Telephone:  (585) 281-6682